Slip Op. 16-67

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **PAPIERFABRIK AUGUST KOEHLER AG,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES**,<br><br>Defendant,<br><br>and<br><br>**APPLETON PAPERS, INC.,**<br><br>Defendant-Intervenor. | **Before: Timothy C. Stanceu, Chief Judge**<br><br>**Consol. Court No. 12-00091** |

### OPINION

[Affirming the redetermination issued by the International Trade Administration, U.S. Department of Commerce in response to a previous order of the court]

Date: July 6, 2016

*F. Amanda DeBusk*, Hughes Hubbard & Reed LLP, of Washington DC, for plaintiff Papierfabrik August Koehler AG.  With her on the brief were *Eric S. Parnes*, *John F. Wood*, *Matthew R. Nicely*, *Lynn G. Kamarck*, and *Alexandra B. Hess*.

*Joshua E. Kurland*, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were *Benjamin C. Mizer*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the brief was *Jessica M. Link*, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Gilbert B. Kaplan*, and *Daniel L. Schneiderman*, King & Spalding, LLP, of Washington DC, for plaintiff and defendant-intervenor Appleton Papers, Inc.

In this consolidated action, plaintiffs Papierfabrik August Koehler AG ("Koehler") and

Appleton Papers, Inc. contested the amended final results issued by the International Trade

Administration, U.S. Department of Commerce ("Commerce" or the "Department") to conclude

the second administrative review ("AR2") of an antidumping duty order on lightweight thermal paper from Germany (the "subject merchandise"). *See Lightweight Thermal Paper from Germany: Notice of Final Results of the 2009-2010 Antidumping Duty Admin. Review*, 77 Fed. Reg. 21,082, 21,083 (Int'l Trade Admin. April 9, 2012) ("*Final Results*"); *Lightweight Thermal Paper from Germany: Notice of Amended Final Results of the 2009-1010 Antidumping Duty Admin. Review*, 77 Fed. Reg. 28,851, 28,852 (Int'l Trade Admin. May 16, 2012) ("*Amended Final Results*").

Before the court is the decision (the "Remand Redetermination") Commerce issued in response to a previous order of the court, which, in response to defendant's request, remanded the amended final results so that Commerce could consider evidence of improper conduct that came to the Department's attention after the amended final results were issued. *Redetermination Pursuant to Court Remand Order in Papierfabrik August Koehler AG v. United States, Consol. Ct. No. 12-00091* (June 16, 2014), ECF No. 75 ("*Remand Redetermination*"). Upon a finding that Koehler fraudulently omitted certain sales from its submitted database of home market sales, the Remand Redetermination assigned Koehler, a German producer and exporter of the subject merchandise, a 75.36% antidumping duty rate based on the use of facts otherwise available, as well as an adverse inference, that Commerce applied to the entire determination. Koehler opposes the Remand Redetermination in a motion for judgment on the agency record. The Remand Redetermination is supported by Appleton Papers, Inc., which is a domestic producer of lightweight thermal paper, the petitioner in the original antidumping duty investigation, and a plaintiff and a defendant-intervenor in this consolidated action. The court denies Koehler's motion for judgment on the agency record and affirms the assignment of the 75.36% rate to Koehler.

# I. BACKGROUND

## A. The Investigation and the Antidumping Duty Order

Concluding an antidumping duty investigation on lightweight thermal paper from Germany, Commerce reached an affirmative final less-than-fair-value determination in October 2008. *Lightweight Thermal Paper from Germany: Notice of Final Determination of Sales at Less Than Fair Value*, 73 Fed Reg. 57,326 (Int'l Trade Admin. Oct. 2, 2008). Commerce determined a weighted-average dumping margin of 6.50% for Koehler, the only exporter/producer individually investigated. *Id.*, 73 Fed. Reg. at 57,328. Following an affirmative final threat determination by the U.S. International Trade Commission (the "Commission"), *see Certain Lightweight Thermal Paper from China and Germany; Determinations*, 73 Fed. Reg. 70,367 (Int'l Trade Comm'n Nov. 20, 2008), Commerce published the antidumping duty order on lightweight thermal paper from Germany (the "Order") later that year. *Antidumping Duty Orders: Lightweight Thermal Paper from Germany and the People's Republic of China*, 73 Fed. Reg. 70,959 (Int'l Trade Admin. Nov. 24, 2008).[1] Because the Commission's determination was as to threat rather than injury, Commerce announced that a rate of 6.50% would apply to lightweight thermal paper from Germany entered, or withdrawn from warehouse, for consumption after the date of publication of the Commission's final determination, i.e., November 20, 2008. *Id.*, 73 Fed. Reg. at 70,960.

---

[1] The order covers "certain lightweight thermal paper, which is thermal paper with a basis weight of 70 grams per square meter ($g/m^2$) (with a tolerance of $\pm 4.0$ $g/m^2$) or less; irrespective of dimensions; with or without a base coat on one or both sides; with thermal active coating(s) on one or both sides that is a mixture of the dye and the developer that react and form an image when heat is applied; with or without a top coat; and without an adhesive backing. *Antidumping Duty Orders: Lightweight Thermal Paper from Germany and the People's Republic of China*, 73 Fed. Reg. 70,959, 70,960 (Int'l Trade Admin. Nov. 24, 2008) (footnotes omitted).

### B.  The First Review of the Antidumping Duty Order

Commerce issued final results of the first periodic administrative review of the Order in April 2011, which applied to a period of review of November 20, 2008 through October 31, 2009.  *Lightweight Thermal Paper from Germany; Notice of Final Results of the First Antidumping Duty Administrative Review*, 76 Fed. Reg. 22,078, 22,079 (Int'l Trade Admin. Apr. 20, 2011).  Commerce determined a weighted-average dumping margin of 3.77% for Koehler, the only reviewed respondent.  *Id.*  Koehler challenged the final results of the first review, claiming that Commerce, when determining normal value, incorrectly failed to reduce the prices in Koehler's home market sales to account for certain monthly rebates ("monatsbonus") paid to home market customers.  Concluding that failure to recognize the rebates was contrary to the Department's regulations, this Court remanded the final results of the first review for reconsideration.  *Papierfabrik August Koehler AG v. United States*, 38 CIT __, 971 Fed. Supp. 2d 1246, 1259 (2014).  In response, Commerce reduced the listed prices in the affected home market sales to allow for the monthly rebates and calculated a margin of 0.03% for Koehler, which was de minimis.  *See Papierfabrik August Koehler AG v. United States*, 38 CIT __, 37 Fed. Supp. 3d 1378, 1381 (2014).  This Court affirmed the remand redetermination.  *Id.*, 38 CIT at __, 37 Fed. Supp. 3d at 1382-83.

### C.  The Second Review of the Antidumping Duty Order

On December 28, 2010, Commerce initiated the second review of the Order, which applies to entries of subject merchandise made between November 1, 2009 and October 31, 2010 (the "Period of Review" or "POR").  *Initiation of Antidumping and Countervailing Duty Admin. Reviews and Request for Revocation in Part*, 75 Fed. Reg. 81,565, 81,567 (Int'l Trade Admin. Dec. 28, 2010).  Koehler was the sole respondent in the second review.

On February 23, 2011, Koehler submitted to Commerce one of its responses to the

Department's series of questionnaires (the "Section A" response) and, on March 2, 2011, filed its

responses to Sections B and C.  *Lightweight Thermal Paper from Germany: Notice of*

*Preliminary Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 76,360, 76,361

(Int'l Trade Admin. Dec. 7, 2011) ("*Prelim. Results*").  Koehler responded to supplemental

questionnaires on June 6, August 18, October 25, and November 14, 2011.  *Id.*  Koehler and its

counsel submitted certifications of accuracy and completeness for these questionnaire responses.

*See Draft Results of Redetermination Pursuant to Court Remand* 3 (Mar. 31, 2014) (Remand

R.Doc. No. 7) ("*Draft Remand Redetermination*").[2]  Relying on Koehler's certified

questionnaire responses, Commerce preliminarily determined that Koehler had made sales in its

home market at less than fair value and preliminarily assigned Koehler a weighted average

dumping margin of 3.16%.  *Prelim. Results*, 76 Fed. Reg. at 76,364.

Commerce published the final results of the second review on April 9, 2012 and issued an

amended version to correct a ministerial error on May 16, 2012 ("Amended Final Results"),

which assigned Koehler a weighted average dumping margin of 4.33%.  *Amended Final Results*,

77 Fed. Reg. at 28,851.

Koehler initiated this action on April 9, 2012.  Summons, ECF No. 1; Koehler's Compl.,

ECF No. 6.  Koehler again claimed that Commerce erred in refusing to include in the calculation

of normal value monthly rebates that Koehler paid to its home market customers.  Koehler's

Compl. ¶¶ 15-17.  During the second review, Commerce concluded, as it had in the first review,

---

[2] Documents contained in parts one or two of the original administrative record for the
underlying administrative review will be cited as "Admin.R.Doc."  Documents contained in the
remand record will be cited as "Remand R.Doc."

that each monthly rebate, or "monatsbonus," was "not a legitimate rebate" because it was "retroactively applied" and was not pursuant to a "written agreement or long-standing practice" as were other rebates Koehler paid to home market customers. *See Issues and Decision Memorandum for the Final Results of the 2009-2010 Administrative Review of the Antidumping Duty Order on Lightweight Thermal Paper from Germany*, A-428-840 ARP 09-10, at 11-14 (Int'l Trade Admin. Apr. 5, 2012) *available at* http://enforcement.trade.gov/frn/summary/germany/2012-8477-1.pdf (last visited June 28, 2016).

Appleton Papers, Inc. ("Appleton" or "Appvion"),[3] a domestic producer of lightweight thermal paper and petitioner in the investigation, also contested the Final Results. Summons (May 9, 2012), ECF No. 1 (Court No. 12-00130); Appleton's Compl. ¶ 14 (June 7, 2012), ECF No. 10 (Court No. 12-00130) (alleging that Commerce erred in determining the constructed export price of subject merchandise produced by Kohler).[4] Appleton later amended its complaint to allege, further, that Koehler had "engaged in a fraudulent scheme to conceal certain otherwise reportable home market transactions" and that "Koehler had sales of the foreign like product that it knew were destined for consumption in Germany, but that it did not report." Appleton's Second Am. Compl. ¶ 17 (July 16, 2014), ECF No. 78.

### B.  The Third Review of the Antidumping Duty Order

On December 30, 2011, prior to releasing the Amended Final Results for the second administrative review, Commerce initiated the third periodic administrative review of the Order,

---

[3] Appleton Papers Inc. ("Appleton") changed its name to Appvion, Inc. without changing the corporate structure. *See* Notification of Name Change (June 21, 2013), ECF No. 50.

[4] The cases were consolidated by court order on July 11, 2012. Scheduling Order, ECF No. 24.

which covered entries during the period of November 1, 2010 through October 31, 2011.

*Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 76 Fed. Reg. 82,268, 82,269 (Int'l Trade Admin. Dec. 30, 2011).  During the third review, Commerce concluded that Koehler intentionally concealed certain home market sales transactions that occurred during the period of that review, using what Commerce termed a "transshipment" scheme that disguised these sales as third-country export sales.  *Issues & Decision Mem. For the Final Results of the 2010-2011 Admin. Review on Lightweight Thermal Paper from Germany*, A-428-840, ARP 10-11, at 3 (Apr. 10, 2013) (Remand R.Doc. No. 8) *available at* http://enforcement.trade.gov/frn/summary/germany/2013-09049-1.pdf (last visited June 28, 2016) ("*AR3 I&D Mem*").

The Department's determination that Koehler engaged in a fraudulent scheme stemmed from allegations Appleton raised during the third review in a May 18, 2012 letter to Commerce, *Lightweight Thermal Paper from Germany: Submission of New Factual Info.* 2-3 (May 18, 2012) (Remand R.Doc. No. 8), which allegations Koehler later admitted were "substantially correct," *AR3 I&D Memo* 2.  Koehler admitted that "the transshipment scheme began during the period covered by the previous administrative review, *i.e.*, November 1, 2009, through October 31, 2010 (AR2)." *Id.*

In the final results of the third review, issued April 18, 2013, Commerce found that Koehler had "(A) [w]ithheld information that had been requested by the Department; (B) failed to provide such information in a timely manner or in the form or manner requested; (C) significantly impeded [the] proceeding; and (D) provided information that cannot be verified." *Lightweight Thermal Paper from Germany: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 23,220, 23,221 (Int'l Trade Admin.

Apr. 18, 2013) ("*AR3 Final Results*").  Using facts otherwise available and an adverse inference,

Commerce assigned Koehler a dumping margin of 75.36% in the third review.  *Id.*[5]

C.  Defendant's Motion that the Court Remand the Amended Final Results for Reconsideration

      On May 30, 2013, defendant moved for a court order remanding the Amended Final

Results so that Commerce could consider how the Department's proper calculation of normal

value is affected by the unreported home market sales that were made during the period of the

second administrative review.  Def.'s Partial Consent Mot. Voluntary Remand, ECF No. 43.  On

December 5, 2013, the court held oral argument on this issue, ECF No. 69, and, with the mutual

consent of the parties, remanded the amended final results to Commerce for further

consideration, Order, ECF No. 71 (Jan. 15, 2014).

D.  The Remand Redetermination Before the Court

      On March 31, 2014, Commerce simultaneously issued a draft remand redetermination

("Draft Remand Redetermination") and reopened the record, placing twenty-three documents

from the third administrative review on the record of the second administrative review.  In the

Draft Remand Redetermination, Commerce found that "Koehler withheld complete and accurate

information regarding its total quantity and value of sales requested in the Section A

Questionnaire, and certain otherwise reportable home market sales transactions, as requested in

the Section B Questionnaire."  *Draft Remand Redetermination* 15 (footnote omitted).  Commerce

determined "that certain necessary information is not available on the record within the meaning

---

    [5] Koehler challenged the results of the third review on multiple grounds before this Court, which affirmed the Department's determination.  *See Papierfabrik August Koehler SE v. United States*, 38 CIT __, 7 F. Supp. 3d 1304 (2014), *reconsideration denied*, 39 CIT __, 44 F. Supp. 3d 1356 (2015).  Koehler appealed this decision on March 25, 2015, and the appeal is pending before the United States Court of Appeals for the Federal Circuit.  *Id.*, *appeal docketed*, No. 15-1489 (Fed. Cir. Mar. 25, 2015).

of section 776(a)(1) of the Act [19 U.S.C. § 1677e(a)(1)]" because of the withholding of

information and that, by "intentionally conceal[ing] certain otherwise reportable home market

transactions," Koehler had "significantly impeded the review." *Id.*

Commerce used facts otherwise available in reaching the decision stated in the Draft

Remand Redetermination, finding that it was "not possible to reach any reliable conclusions

based on Koehler's data" and further finding that it was "not practicable or appropriate during

this remand proceeding to provide Koehler with the opportunity to remedy the deficiency of its

reporting" because Koehler had engaged in a transshipment scheme, had failed to acknowledge it

until Appleton reported it in the third administrative review, and had intentionally concealed

"otherwise reportable home market sales." *Id.* at 17, 19.  For these same reasons, Commerce

determined "that Koehler failed to cooperate to the best of its ability" to comply with the

Department's request for information and applied an adverse inference to its selection of the

facts otherwise available. *Id.* at 19.  When Koehler attempted, after the amended final results

were published, to submit an amended home market sales database that included the sales it had

omitted when it reported its home market sales during the second review, Commerce rejected the

submission as "untimely" and "unsolicited." *Id.* at 9 n.4.  Commerce added, "if we were to allow

Koehler to provide information which it intentionally concealed, only after another party brought

the issue to our attention, it would allow a party to game the system and not provide truthful

information when it is required to do so." *Id*. at 17.

In the Draft Remand Redetermination, Commerce determined it appropriate to apply to

Koehler a rate 75.36% for the second review, based on the information provided in the petition

and in furtherance of the Department's practice "to assign the highest margin determined for any

party in the LTFV [less-than-fair-value] investigation or in any administrative review of a

specific order to respondents who fail to cooperate with the Department." *Id.* at 20-21.

Commerce found the petition rate "reliable and relevant in light of Koehler's highest transaction-

specific margin calculated during AR2," concluding that the 75.36% rate could be corroborated

"because it falls within the range of transaction-specific margins the Department calculated

based on Koehler's reported data." *Id.* at 22-23.

In the cover letter attached to the Draft Remand Redetermination, Commerce invited the

parties to submit comments as well as "submit new factual information specifically related to the

rate being applied and the corroboration of this rate" but noted that the Department would "not

accept any information that could be considered responsive to the Department's initial

questionnaire or supplemental questionnaires from the underlying 2009-2010 administrative

review proceeding, including additional sales data for the period of review." *Id.* at Cover Letter.

Commenting on the Draft Remand Redetermination, Koehler again attempted to file for the

record information on the home market sales Koehler omitted from its reported database in

responding to questionnaires in the second review as well as certain information regarding a

single sale upon which Commerce relied in the Draft Remand Redetermination for corroboration

of the 75.36% rate Commerce determined in that draft. *See Koehler's Comments on Draft

Results of Redetermination and Submission of Factual Information* (Apr. 28, 2014) (Remand

R.Doc. No. 13).  Commerce rejected all of this new information three days later, stating it

"should have been provided in response to the Department's initial questionnaire and

supplemental questionnaires." *Rejection of Submission Filed by Papierfabrik August Koehler SE

(Koehler)* 2 (May 2, 2014) (Remand R.Doc. No. 18).  Three days later, in response to the

Department's directive, *id.* at 3, Koehler retendered its comments on the Draft Remand

Redetermination "in redacted form to remove the rejected information" and protested "that the

Department erred in rejecting that information." On May 13, 2014, Koehler and Appleton

submitted rebuttal comments. *Remand Redetermination* 2.

On June 16, 2014, Commerce submitted to the court its final Remand Redetermination.

*Id.* Mirroring the draft version, the Remand Redetermination applied a rate of 75.36% to

Koehler and relied on facts otherwise available with an adverse inference. *Id.* at 2-3. Commerce

continued to corroborate the dumping margin using a transaction-specific margin of 144.63%

that Commerce determined according to data on a single sale Koehler reported in the second

review. *Id.* at 23-24.

One month after Commerce filed the Remand Redetermination, Koehler, with leave of

court, filed its second amended complaint, in which it raised numerous objections to the

assignment of the 75.36% antidumping duty rate. Second Amend. Compl. ¶¶ 19-31

(Jan. 1, 2014), ECF No. 79; Order (July 16, 2014), ECF No. 71. Pursuant to this complaint,

Koehler filed a motion for judgment on the agency record on September 22, 2014, Pl.'s R. 56.2

Mot. J. Agency R., ECF No. 87 (public), ECF No. 86 (confidential) ("Pl.'s Br."), to which

Appleton and defendant responded on February 24, 2015 and March 3, 2015, respectively, Resp.

Br. of Def.-Int. in Opp'n to Pl.'s Mot. J. Agency R., ECF No. 100 (public), ECF No. 99

(confidential); Def.'s Mem. in Opp'n to Pl.'s and Def.-Int.'s Mot. for J. Agency R., ECF No. 107

(public), ECF No. 106 (confidential). Koehler and Appleton filed reply briefs. Pl.'s Reply Br.

(Apr. 8, 2015), ECF No. 116 (public), ECF No. 115 (confidential); Reply Br. of Def.-Int.

(Apr. 7, 2015), ECF 112.

On October 21, 2015, defendant filed a notice of supplemental authority concerning the

opinion of the Court of Appeals for the Federal Circuit ("Court of Appeals") in *Ad Hoc Shrimp*

*Trade Action Comm. v. United States*, Nos. 2014-1514, 2014-1647, 2015 WL 5781477 (Fed. Cir.

Oct. 5, 2015).  Def.'s Notice Supp. Auth., ECF No. 127.  On November 2, 2015, Koehler filed a

response, Pl.'s Resp. to Def.'s Notice Supp. Auth., ECF No. 128, and on November 12, 2015

defendant-intervenor responded, Def.-Int.'s Resp. to Def.'s Notice Supp. Auth., ECF No. 129.

On November 20, 2015, defendant moved for leave to respond to Koehler's and Appleton's

briefing on this issue.  Def.'s Mot. Leave to Respond Substantive Briefs re: Supp. Auth., ECF

No. 130.  On December 4, 2015, Koehler filed a motion for leave to reply to defendant and

defendant-intervenor's responses.  Pl.'s Mot. Leave to Reply Def. and Def.-Int.'s Resp. re:

Notice Supp. Auth., ECF No. 131.

On January 27, 2016, Appleton filed a notice of supplemental authority discussing *Nan

Ya Plastics Corp. v. United States*, No. 2015-1054 (Fed. Cir. Jan. 19, 2016).  Def.-Int.'s Notice

Supp. Auth., ECF No. 134.  Koehler and defendant responded on February 11, 2016 and

March 30, 2016, respectively.  Pl.'s Resp. to Def.-Int.'s Notice Supp. Auth., ECF No. 135; Def.'s

Resp. to Def.-Int.'s Notice Supp. Auth., ECF No. 140.  Koehler filed a motion for leave to reply

to defendant's response on April 14, 2016.  Pl.'s Mot. Leave to Reply to Def.'s Comments re:

Def.-Int.'s Notice Supp. Auth., ECF No. 141.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction over this action according to section 201 of the Customs

Courts Act of 1980, 28 U.S.C. § 1581(c).[6]  This provision grants the Court of International Trade

exclusive jurisdiction over a challenge brought under section 516A(a)(2)(A)(i)(I) of the Tariff

---

[6] Except where otherwise noted, all statutory citations herein are to the 2006 edition of
the United States Code and all regulatory citations herein are to the 2012 edition of the Code of
Federal Regulations.

Act of 1930, as amended (the "Tariff Act"), 19 U.S.C. § 1516a(a)(2)(A)(i)(I), including those

contesting the final results of an administrative review issued under section 751 of the Tariff Act,

19 U.S.C. § 1675(a).  The court will sustain a determination by Commerce if it complies with the

court's order, is supported by substantial evidence on the record, and is otherwise in accordance

with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

B.  The Court Affirms the Department's Assignment of a 75.36% Rate to Koehler

Koehler raises numerous arguments against the Department's assigning it a 75.36% rate

in the Remand Redetermination.  Koehler's first claim is, essentially, that Commerce unlawfully

assigned that rate based on facts otherwise available and an adverse inference and instead was

required to assign Koehler a de minimis margin based on the data Koehler actually submitted.

Koehler maintains that the information it withheld during the second review was so limited in

scope as to be "insignificant" and would have made no material difference in the calculation of

any margin that is correctly determined according to Koehler's data on its home market and U.S.

sales.  Koehler's Br. 17-18, 26-29.  According to Koehler, had Commerce properly reduced

normal value to account for the monthly rebates it made to home market customers, the

calculated margin would have been de minimis whether or not Commerce were to include in the

calculation the previously withheld information.  *Id.* at 28-29.

The inherent flaw in Koehler's claim is Koehler's positing that Commerce lacked the

authority to respond as it did to the uncontested evidence concerning Koehler's fraudulent

conduct during the second review.  Koehler's admissions that Appleton's allegations of fraud

were substantially correct and that the transshipment scheme began during the period of the

second review are on the remand record of this proceeding.  *See AR3 I&D Memo* 2.  Notably,

Koehler does not contest the Department's findings in the Remand Redetermination that Koehler

intentionally engaged in a scheme to underreport its home market sales or that the home market

sales database it reported to Commerce during the second review was affected by this scheme. These two findings, therefore, not only are supported by substantial record evidence but also are undisputed.  Based on these findings, Commerce permissibly concluded that Koehler's misreporting of its home market sales database prevented it from determining the correct normal value for Koehler's subject merchandise during the review.  *See Remand Redetermination* 2 ("In light of Koehler's incomplete reporting in AR2, we find that Koehler failed to provide accurate information and sales data required by the Department to evaluate the level of Koehler's dumping."), 13 ("Koehler knowingly submitted inaccurate and incomplete sales data which are essential for the Department to calculate a dumping margin for Koehler's [*sic*] in the AR2 proceeding.").  Further, Commerce found as to this reporting that "Koehler deliberately provided false information, despite the fact that Koehler and its representatives certified to the accuracy and completeness of such information in response to the Department's initial questionnaire and four supplemental questionnaires issued in AR2."  *Id.* at 2.

In summary, Commerce found that Koehler's intentional reporting of an incomplete and inaccurate database of home market sales during the second review prevented Commerce from determining a valid antidumping duty margin for Koehler at the time it conducted the review. Substantial evidence supports the finding that the database was intentionally underreported and the finding that Commerce could not have used that database to reach a valid margin for Koehler before the second review was concluded.  That the omitted information may have been immaterial, in a numerical sense, to any margin determined after the issuance of the Amended Final Results does not change the controlling facts, which are that the home market database was fraudulently underreported to Commerce at the time the statute required Koehler to submit it and that Commerce thereby was prevented from performing its statutory responsibility.

The antidumping statute provided Commerce ample authority to disregard entirely the falsified home market sales database Koehler reported during the second review.  If "necessary information is not on the record or an interested party or any other person withholds information" requested by Commerce, "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," or "significantly impedes a proceeding under this subtitle," Commerce is directed to "use facts otherwise available in reaching the applicable determination."  19 U.S.C. § 1677e(a).  With respect to 19 U.S.C. § 1677e(a), Commerce found in the Remand Redetermination, based on substantial record evidence, that "Koehler withheld complete and accurate information regarding its total quantity and value of sales" as requested by the Department.  *Remand Redetermination* 15.  Commerce further found, with respect to this statutory provision, that "Koehler intentionally concealed certain otherwise reportable home market transactions, and thereby significantly impeded the review."  *Id.* at 16.  This finding, too, is supported by the record evidence.  Because Commerce could not have used the underreported home market sales database to calculate a valid margin for Koehler, Koehler not only "impeded" the review proceeding but also went so far as to take deliberate steps preventing Commerce from fulfilling its duty under the statute.  Commerce, therefore, was authorized by the statute to determine a margin upon remand that was based entirely on the facts otherwise available.

The statute further provides that if an "interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  In this case, it is an understatement to say that Koehler failed to act to the best of its ability when responding to the relevant questionnaires.  The statute allows

Commerce, when using an adverse inference in selecting from among the facts otherwise

available, to use "facts from the petition," *id.* at § 1677e(b)(2)(a), which in this case were the

basis for the 75.36% rate.  Commerce must be allowed to apply 19 U.S.C. § 1677e(b) in a way

that deters intentional conduct of the sort presented in this case, which prevented it from

fulfilling its statutory responsibility.  Below, the court presents its reasons for affirming the

Department's selection of the 75.36% rate for application to Koehler.

1.  In Determining a Rate for Koehler, Commerce Was Not Required to Give Koehler the Benefit
        of the Home Market Sales Data Koehler Omitted from its Initial Reporting

        Koehler bases several arguments on the volume and value information for the sales it

omitted when reporting its home market sales database in questionnaire responses it submitted

during the second review.  Noting that it attempted to submit this information during the remand

proceeding, along with a completed home market database, Koehler argues that Commerce,

rather than reject this information, was required to admit it to the remand record and consider it

because it was "relevant, necessary for this proceeding, and timely."  Koehler's Br. 15.  The

court disagrees.

        As to timeliness, Koehler was required to report the information during the second

review.  Considered according to the terms of 19 U.S.C. § 1677e(a), the missing information was

not submitted "timely"; rather, it was not submitted at all.  The remand proceeding does not give

Koehler a second chance to comply with the duties imposed upon it by statute, which were not

only to respond timely, and to the best of its ability, to the Department's information requests but

also to act in good faith.  Instead, Koehler intentionally reported an incomplete home market

sales database in perpetrating a fraud upon the agency conducting the review.

        Nor is the withheld information "relevant" and "necessary for this proceeding."  Koehler

submits that "[t]he purpose of this remand proceeding is to determine the appropriate response to

the fact that certain information was omitted from the record of AR2." *Id.* at 16.  According to

Koehler, "Commerce cannot fulfill this mandate and determine the appropriate response unless it

has information on the nature of the information and extent of the information that was omitted –

yet, this is precisely the information that Commerce excluded." *Id*.  In arguing that Commerce

was required to admit the withheld information to the remand record, Koehler cites 19 C.F.R.

§ 351.301(c)(4), the Department's practice prior to the promulgation of that regulation, and two

decisions of this Court.  *Id.* at 19-22.  Koehler's argument misses the point.[7]  The court need not

decide whether Commerce was required to admit to the record the information Koehler had

previously, and intentionally, withheld.  Admitting that information to the record could have

done nothing to change the controlling fact that Koehler purposefully withheld that same

information at the time it was required to submit it, i.e., in response to questionnaires during the

second review.  The database Koehler reported within the time period allowed for its submission

was deliberately underreported and, therefore, unusable at that time for the purpose of

determining a valid margin.  However presented, the gist of Koehler's argument is that the court

must now compel Commerce to give Koehler the mitigating benefit of the very information

Koehler acknowledges it fraudulently withheld during the second review.  Nothing in the statute,

---

[7] The regulation Koehler cites, 19 C.F.R. § 351.301(c)(4), was promulgated with an effective date after the initiation of the second review and is, therefore, inapplicable. *Definition of Factual Information and Time Limits for Submission of Factual Information*, 78 Fed. Reg. 21,246, 21,246 (Int'l Trade Admin. Apr. 10, 2013) (stating that the regulation will "apply to all segments initiated on or after" May 10, 2013); *see also* 19 C.F.R. § 351.102(47)(i)-(ii) (defining "segment of proceeding" as "a portion of the proceeding that is reviewable under section 516A of the Act" and providing examples, such as "[a]n antidumping or countervailing duty investigation or a review of an order").  The two decisions of this Court upon which Koehler relies, *Wuhu Fenglian Co. v. United States*, 36 CIT __, 836 F. Supp. 2d 1398 (2012) and *Crawfish Processors Alliance v. United States*, 28 CIT 646, 343 F. Supp. 2d 1242 (2004), are not analogous to this case.

the Department's regulations, or the Department's administrative practice requires such a remarkable result.

Koehler contends that "when Commerce acts contrary to a standard practice without reasonable explanation, it acts arbitrarily," citing *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003), among other cases. *Id.* at 21.  Koehler posits that, here, "[a]ny departure from that regulation [19 C.F.R. § 351.301(c)(4)] and practice was required to be reasonable, explained, and not arbitrary," *id.*, claiming that "Commerce's blind application of its exception without a legitimate purpose precluded Koehler from a meaningful opportunity to rebut, clarify, or correct the new information Commerce placed on the record." *Id.* at 22. Because Commerce gave a reasonable explanation for not considering the previously unreported information, this argument is also unpersuasive.

Commerce explained in the Remand Redetermination that "Koehler engaged in a transshipment scheme which concealed certain otherwise reportable home market sales during the AR2 review," that the scheme "was not revealed" until the petitioner raised it during the third administrative review, and that Koehler subsequently acknowledged the truth of petitioner's allegations.  *Remand Redetermination* 17-18.  Commerce concluded that it was not "practicable or appropriate during this remand proceeding to provide Koehler with the opportunity to remedy the deficiency of its reporting," reasoning that were it "to allow Koehler to provide information which it intentionally concealed, only after another party brought the issue to our attention, it would allow a party to game the system and not provide truthful information when it is required to do so." *Id.* at 18.  The court finds nothing deficient in the Department's explanation for its refusal to give Koehler the benefit of the wrongfully withheld information.

Koehler also contends that in rejecting its submissions Commerce violated the "general notions of procedural due process and fundamental fairness." Koehler's Br. 22. According to Koehler, these due process notions "dictate that Commerce must provide Koehler an opportunity to be heard and must provide this Court with a record by which it can provide meaningful review pursuant to the substantial evidence standard." *Id*. Koehler quotes *Techsnabexport Ltd. v. United States*, 16 CIT 420, 427-28, 795 F. Supp. 428, 436 (1992) for the principle that the "essential elements of due process are notice and the opportunity to be heard." *Id*. The court discerns no due process violation here.

Koehler had the full opportunity to participate in, and thereby be "heard" in, the second review, during which it fraudulently withheld from Commerce certain information essential to the Department's calculation of an antidumping duty margin for Koehler. In participating in the review, Koehler was under a duty to act in good faith, a duty to which it did not adhere. Koehler argues, unconvincingly, that due process considerations now require Commerce, as well as the court, to afford it the mitigating benefit of the very information it wrongfully withheld, despite Koehler's having admitted to the essential facts concerning its intentional underreporting during the second review. In exercising its discretion in the Remand Redetermination, Commerce in no sense denied Koehler fundamental fairness or the opportunity to be heard.

### 2.  Commerce Had a "Sufficient Basis" to Amend the Final Results

Asserting that its "inaccuracies" in reporting were "insignificant and immaterial," Koehler argues that Commerce lacked a "sufficient basis" to amend the Final Results and in doing so "did not properly balance interests of finality, the extent of the inaccuracies, the level of materiality, and other factors such as Koehler's cooperation with Commerce under the circumstances." Koehler's Br. 24, 26. In citing the "extent of the inaccuracies" and "the level of

materiality," this argument fails by sidestepping the controlling fact that Koehler fraudulently

underreported its home market sales database during the second review.  The underreporting

itself and in particular the extent, however minor it might have been, to which it undermined the

accuracy and completeness of the questionnaire responses Koehler submitted were concealed

from Commerce during that review.  The statute specifically requires compliance with

information requests during the time periods established in the proceeding.  *See*, *e.g.*, 19 U.S.C.

§§ 1677e, 1677m(d)(2), 1677m(e)(1).  Certainly, it cannot have been an abuse of discretion for

Commerce to decide to view Koehler's intentional noncompliance from the perspective of the

time at which Commerce conducted the second review, during which time Koehler's duty of

good faith compliance arose.

As to the "interests in finality," Koehler argues that it "voluntarily notified Commerce of

the missing sales in AR2 and agreed to this remand even though doing so was not necessary to

protect the integrity of the review" because "the corrected information does not have a material

effect on the margin calculation."  Koehler's Br. 30.  Koehler posits that altering the Final

Results was, therefore, an abuse of discretion because "the interest in correcting immaterial

errors does not outweigh the interests of finality and other additional factors, such as Koehler's

cooperation in this proceeding."  *Id.*  Koehler warns that, by ignoring this cooperation and

altering the Final Results, Commerce runs the risk of sending a "message to other parties that

those who cooperate in correcting misconduct will be treated no differently than those who do

not."  *Id.*  The record evidence, however, does not support this argument.  Commerce did not

find, and was justified in not finding, that but for Koehler's cooperation and disclosure the

"misconduct" would not have been corrected.

The record reveals that during the second review the petitioner, Appleton, expressed a suspicion that Koehler had manipulated its home market sales database by excluding certain sales of merchandise that were to be consumed in Germany. *Appvion's Comments on the Second Supplemental Questionnaire Responses of Koehler* 3 (Aug. 30, 2011) (Admin.R.Doc. No. 2.4). In these allegations, Appleton lodged specific accusations that Koehler was participating in a scheme to manipulate its reporting of home market sales involving one of its customers in particular, *id.* at 3-5; this was one of the same customers to whom Koehler sold merchandise in the transshipment scheme to which Koehler eventually admitted with respect to the third administrative review. *Remand Redetermination* 8-9. Appleton did not yet have the details, and the proof, it brought to the Department's attention during the third review, but its suspicions of underreporting were grounded in what Appleton viewed as unexplained irregularities in Koehler's reporting of the home market database. During the second review, when Commerce responded to petitioner's claims with inquiries directed to Koehler, Koehler responded, notably, that it had "reported all sales of the subject merchandise during the POR with a 'ship-to' address within Germany," *Supplemental Questionnaire Response of Koehler* 1-2 (Oct. 24, 2011) (Admin.R.Doc. No. 2.6). *See Remand Redetermination* 8-9.

The court also rejects Koehler's argument that, due to the importance of "finality," Commerce was not justified in altering the original outcome of the second review. Commerce discovered Koehler's fraudulent underreporting of the home market database after publishing the amended final results and acted justifiably in moving for an order remanding that decision incident to this judicial review proceeding. Even if it is assumed that the underreporting was, as Koehler argues, minor and immaterial in a numerical sense, it was not minor in its significance, for it compromised the integrity of the second administrative review proceeding.

### 3.  Commerce Permissibly Relied on an Adverse Inference

Koehler argues that "Commerce abused its discretion by applying an adverse inference in

its use of facts available" because "[i]n determining whether the application of an adverse

inference is warranted, Commerce must examine whether the errors or the missing information is

material," Koehler's Br. 31, which, Koehler submits, it was not.  Here again, Koehler's argument

would have the court direct Commerce to give Koehler the benefit of the information Koehler

intentionally withheld during the second review.  As discussed above, Commerce was well

within its authority in viewing the withholding of information from the standpoint of Koehler's

conduct during the second review.

Koehler relies on *Ferro Union, Inc. v. Unites States*, 23 CIT 178, 201, 44 F. Supp.

2d 1310, 1332 (1999), in arguing that Commerce improperly failed to consider the lack of

materiality of the missing information and on *Mannesmannrohren-Werke AG v. United States*,

23 CIT 826, 849, 77 F. Supp. 2d 1302, 1321-22 (1999) in arguing that de minimis errors cannot

justify an adverse inference.  These cases are inapposite.  In *Mannesmannrohren-Werke*, the

respondent had provided Commerce with requested information, but those figures "slightly

var[ied] from those calculated by Commerce" and the respondent "was unable to recreate or

explain at verification the method by which it arrived at the results."  *Mannesmannrohren-

Werke*, 23 CIT at 849, 77 F. Supp. 2d at 1322.  In *Ferro Union*, the failure to identify properly

affiliated companies was held not to be "alone [ ] a significant impediment" to the review and,

therefore, Commerce could not properly "apply total adverse facts on the basis of the non-

identification of these companies."  *Ferro Union*, 23 CIT at 201, 44 F. Supp. 2d at 1332.  In

contrast, Koehler engaged in deliberate underreporting and thereby prevented Commerce from

fulfilling its statutory responsibility.  Commerce must be afforded discretion to take decisive

action to deter such conduct and encourage full and honest compliance in the future.

    In further support of its argument that Commerce should not have drawn an adverse

inference, Koehler also relies on the Statement of Administrative Action ("SAA") accompanying

the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 868, 870 (1994), *reprinted in*

1994 U.S.C.C.A.N. 4040, 4198-99, which states that "[i]n employing adverse inferences, one

factor the agencies will consider is the extent to which a party may benefit from its own lack of

cooperation."  On the particular, and unusual, facts of this case, the language from the SAA does

not preclude Commerce from using an adverse inference in choosing from among facts

otherwise available in response to Koehler's fraudulently misreported home market database.  As

the court has emphasized, the information upon which Koehler seeks to have Commerce reach a

finding that Koehler would not have benefitted from the underreporting, i.e., the "missing"

information upon which Koehler relies in arguing that it would have qualified for a de minimis

margin in any event, was intentionally withheld from Commerce during the second review.

Commerce is under no obligation to reach the finding Koehler advocates, i.e., a finding that

Koehler did not benefit from its own lack of cooperation.

    Similarly, citing various decisions of this Court, Koehler argues that even were an

adverse inference warranted, Commerce should have used the data on home market sales that

Koehler submitted during the second review, which Koehler describes as "timely" and

"verifiable," and should have confined any adverse inference to the sales that were omitted from

Koehler's original data.  Koehler's Br. 34-39.  As do many of Koehler's arguments, this

argument overlooks the essential point that the data on the omitted sales, due to Koehler's own

misconduct, were not submitted during the second review.  This factual situation is

distinguishable from those in the cases Koehler cites.

####    4.  The Department's Choice of the 75.36% Rate Is Not Invalidated by the Corroboration Provision in the Statute

In the Remand Redetermination, Commerce explained that it applied a dumping margin

of "75.36 percent, the highest rate on the record of this proceeding, derived from information

provided in the petition, to exports by Koehler," determining that "this information is the most

appropriate, from the available sources, to effectuate the purposes of AFA." *Remand*

*Redetermination* 21-22.  Commerce cited section 776(b)(1) of the statute, 19 U.S.C.

§ 1677e(b)(1), and its regulations, 19 C.F.R. § 351.308(c)(1) and (2), as authorizing it to rely on

information derived from the petition in using an inference adverse to Koehler.  *Id.* at 21.

Commerce considered its use of the 75.36% rate to be "corroborated" after examining

"the transaction-specific margins calculated for Koehler in this review, AR2," concluding that

the "75.36 rate is relevant and reliable because it falls within the range of transaction-specific

margins the Department calculated based on Koehler's reported data, with the highest

transaction-specific margin being 144.63 percent." *Id.* at 23 (footnote omitted).  Commerce

found that this rate, which Commerce calculated from a single sales transaction conducted by

Koehler during the POR for the second review, was "based on Koehler's own data" and was,

"therefore, reflective of Koehler's commercial business practices in this segment of the

proceeding." *Id.* at 23-24.  Commerce concluded, further, that "there is no information on the

record that demonstrates that the sale underlying this margin is aberrant." *Id.* at 24.  Commerce

also opined that its "corroboration exercise was conservative," noting that "had Koehler properly

disclosed its concealed sales, it is likely that there could have been additional transaction-specific

margins at or above the level of the AFA rate being applied." *Id.*

Koehler claims that the 75.36% rate selected by Commerce was not supported by substantial evidence because it does not reflect Koehler's "commercial reality," Koehler's Br. 41, and does not meet the corroboration requirement of 19 U.S.C. § 1677e(c), which, Koehler argues, must be met when Commerce uses "secondary information as AFA [adverse facts available], including petition rates," *id.* at 46 (footnote omitted).  Koehler maintains that "the fact that the AFA rate is eleven times Koehler's highest actual verified rate demonstrates the rate is not supported by substantial evidence." *Id.* at 41-42.  Additionally, Koehler contends that the 144.63% margin Commerce used to corroborate the 75.36% rate was "erroneous, clearly aberrational" and "based on data that Commerce has now deemed to be unreliable." *Id.* at 40-41. Koehler submits that the 144.63% transaction-specific margin Commerce calculated was the result of Koehler's incorrectly applying "the total cash discount for three line items . . . to *each* line item." *Id.* at 50.

The statute, in 19 U.S.C. § 1677e(c), provides that when Commerce or the Commission "relies on secondary information rather than on information obtained in the course of an investigation or review," Commerce or the Commission, "as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal."[8]  The SAA discusses the corroboration provision as follows:

> Consistent with Annex II, paragraph VII of the Agreement, section 776(c) [19 U.S.C. § 1677e(c)] requires Commerce and the Commission to corroborate secondary information where practicable using independent sources.  Secondary

---

[8] Congress amended the corroboration provision in the American Trade Enforcement Effectiveness Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (codified at 19 U.S.C. § 1677e(c)). The amendment was not made effective retroactively so as to apply to the determination before the court. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1350-51 (Fed. Cir. 2015).

> information is information derived from the petition that gave rise to the
> investigation or review, the final determination concerning the subject
> merchandise, or any previous review under section 751 concerning the subject
> merchandise.  Secondary information may not be entirely reliable because, for
> example, as in the case of the petition, it is based on unverified allegations, or as
> in the case of information from prior section 751(a) reviews, it concerns a
> different time frame than the one at issue.  Independent sources may include, for
> example, published price lists, official import statistics and customs data, and
> information obtained from interested parties during the particular investigation or
> review.

SAA, H.R. Doc. No. 103-316 at 870, 1994 U.S.C.C.A.N. at 4199.  The SAA further explains that

"[c]orroborate means that the agencies will satisfy themselves that the secondary information to

be used has probative value."  *Id.*  Commerce has incorporated into its applicable regulation this

definition and other explanation from the SAA.  *See* 19 C.F.R. § 351.308(d).  As the SAA and

the regulation clarify, the intent underlying the corroboration provision is to ensure, to the extent

practicable, that secondary information is, in the words of the SAA and the regulation, "reliable."

The SAA and the Department's regulation contemplate that Commerce will consider whether

secondary information is reliable by ascertaining the "probative value" of such information.

Commerce found that the information from a single transaction reported by Koehler

during the second review, from which Commerce calculated a transaction-specific margin of

144.63%, had probative value with respect to its chosen rate of 75.36%.  *See Remand

Redetermination* 23.  The court concludes that this finding is not supported by substantial

evidence on the record.

When Koehler attempted to submit new information during the remand proceeding to

show that the 144.63% individual margin was grossly inflated due to Koehler's having reported

erroneously, during the second review, the information underlying the transaction, Commerce

rejected that new information.  Commerce did so even though it had invited the parties to

"submit new factual information specifically related to the rate being applied and the

corroboration of this rate." *Draft Remand Redetermination*, Cover Letter.  In inviting new

information for the reopened record, Commerce also stated that it would "not accept any

information that could be considered responsive to the Department's initial questionnaire or

supplemental questionnaires from the underlying 2009-2010 administrative review proceeding,

including additional sales data for the period of review." *Id.*  On that ground, Commerce

rejected the transaction-specific information Koehler attempted to submit during the remand

proceeding to show that the 144.63% margin Commerce calculated for the transaction was

erroneous.

The court need not decide whether Commerce acted within its authority in rejecting the

information Koehler sought to place on the remand record concerning the 144.63% margin.  For

even if the court assumes, *arguendo*, that Commerce had this authority, the court still must

conclude that the 144.63% margin is not evidence corroborating as "probative" the Department's

use of the 75.36% rate as secondary information.[9]  The Department's calculated margin of

144.63% percent is aberrant when compared to a margin obtained from any other specific

transaction, none of which yielded a margin close to 144.63%, and is extremely aberrant when

viewed against a weighted average of all individual margins.  The information Koehler attempted

to submit to demonstrate that the 144.63% margin was erroneous was "reasonably at" the

Department's "disposal" within the meaning of 19 U.S.C. § 1677e(c) as explicated in the SAA

---

[9] Koehler submits that applying the discount correctly, rather than erroneously, to all line items in the sales transaction in question would yield a negative margin rather than a margin of 144.63%.  Koehler's Br. 50.  Because the 144.63% margin is aberrant and cannot serve as corroboration, the court need not decide whether Koehler's recalculation is correct.

and interpreted by the Department's regulation, 19 C.F.R. § 351.308(d).[10]  After excluding this

information from the record during the remand proceeding, Commerce offered the self-serving

statement that "there is no information on the record that demonstrates that the sale underlying

this margin is aberrant." *Remand Redetermination* 24.  With or without this additional

information, Commerce did not have on the record substantial evidence to support its finding

that the sales transaction underlying its calculated 144.63% margin could serve to corroborate the

rate it chose as an adverse inference.

        In further support of its chosen adverse inference rate of 75.36%, Commerce concluded

that "had Koehler properly disclosed its concealed sales, it is likely that there could have been

additional transaction-specific margins at or above the level of the AFA rate being applied."  *Id*.

Rather than constitute a finding based on substantial record evidence, this conclusion is entirely

based on speculation.  A valid agency finding as to corroboration (or indeed, as to any issue)

cannot be based solely on a *lack* of record evidence.[11]

---

[10] The regulation provides, in pertinent part, that

> Under section 776(c) of the Act, when the Secretary relies on secondary information, the Secretary will, to the extent practicable, corroborate that information from independent sources that are reasonably at the Secretary's disposal.  Independent sources include, *but are not limited to*, published price lists, official import statistics and customs data, and information obtained from interested parties during the instant investigation or review.

19 C.F.R. § 351.308(d) (emphasis added).

[11] The information Koehler attempted to submit to show the de minimis effect on its margin of the sales it intentionally withheld from disclosure is also information reasonably at the Department's disposal for purposes of corroboration.  Commerce chose to reject and thereby disregard this information for purposes of its decisions to use total facts otherwise available and an adverse inference, and the court, as discussed above, takes no issue with that decision.  The court does not reach a conclusion that Commerce was required to consider this information in its

(continued . . .)

Although the single transaction from which Commerce calculated a 144.63% margin lent

no evidentiary support to corroboration of the 75.36% rate as secondary information, certain

other record evidence has some, albeit limited, probativity on that issue.  As Koehler concedes,

two transactions yielded significant margins, which were in the approximate range of 30-50%,

*see* Koehler's Br. 53, and 18 transactions had margins in the 20-30% range, *see id.* at 52.  Still,

the evidence as a whole does not support a finding that Koehler would have received a high

margin had it cooperated fully and in good faith.

Koehler submits that the overwhelming majority of its reported transactions in the second

review had margins between negative 10 percent and positive 10 percent, *see id.*, a contention to

which defendant does not marshal record evidence in rebuttal.  Commerce determined a

weighted average margin of only 4.33% for Koehler in the Amended Final Results of the second

review, and this margin could only have been reduced were Commerce to have accounted for the

monthly rebates on Koehler's home market sales.  Other information reasonably at the

Department's disposal, information of which the court may take judicial notice, is also probative.

In the investigation, Commerce determined a margin of 6.50% for Koehler, but even that margin

would have applied to Koehler's subject merchandise only had Koehler not been reviewed in the

first administrative review of the Order.  The period of review for the first administrative review

extended back to November 20, 2011, the date of the Commission's affirmative threat

determination, and thereby covered all entries of Koehler's merchandise to which the Order,

--------------------------

(. . . continued)

corroboration analysis.  But having chosen to exclude this information entirely from the record,
Commerce at the same time could not validly have relied on the missing information in *support*
of its corroboration analysis.

which became effective only after that date, applied prior to the second review.  Because Koehler

*was* reviewed in the first administrative review and qualified for a de minimis margin upon

conclusion of all court proceedings relating to the first review, the only margin actually

applicable to any of Koehler's subject merchandise prior to the second review was, effectively, a

margin of zero.

In summary, Commerce erred in finding that the transaction underlying its calculated

144.63% margin could serve to corroborate its 75.36% rate, but there is other record evidence

with *some*, albeit extremely limited, probativity on the issue of the "reliability" of the 75.36%

rate Commerce chose as secondary information.  *See* SAA, H.R. Doc. No. 103-316 at 870, 1994

U.S.C.C.A.N. at 4199.  Probativity is a matter of degree, and that evidence is, accordingly, the

minimal extent to which that rate can be said to be "corroborated."  The question the court

considers next is whether such a minimal extent of corroboration is sufficient to support the

Department's decision to impose a rate of 75.36% as an adverse inference.  Based on the

extraordinary factual situation posed by this case and a consideration of the statutory provisions

involved, the court concludes that it is.

The court begins by considering the purposes of two statutory provisions, 19 U.S.C.

§ 1677e(b), the "adverse inference" provision, and 19 U.S.C. § 1677e(c), the "corroboration"

provision.  The purpose of § 1677e(b) is evident from the very words Congress chose:

Commerce or the Commission may use an inference that is *adverse* to the *interests* of a

noncooperating party when choosing from among the information otherwise available.  As the

Court of Appeals has instructed, § 1677e(b) provides Commerce the authority to use an inference

adverse to the interests of such a party in order to deter future noncompliance.  *See*, *e.g.*, *F.lli De*

*Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)

("*De Cecco*").

The purpose of the corroboration provision of § 1677e(c) is, as discussed previously, to ensure that Commerce, to the extent "practicable" when using secondary information, uses secondary information that is "reliable." As applied to the choice of facts otherwise available with an adverse inference, the corroboration provision serves to ensure that Commerce, when seeking to deter future noncooperation, does not "overreach." *See id*.

It is possible to envision one or more factual situations in which a respondent's failure to "cooperate" in an antidumping investigation or review consists of misconduct so serious that it undermines the very integrity of the proceeding. Although not the ordinary circumstance, it is also possible that a respondent committing serious misconduct might have received a small or de minimis margin even had it cooperated fully and in good faith. In such an unusual circumstance, were a court to insist that Commerce confine its discretion to the use of a rate constituting secondary information that is *fully* corroborated, i.e., a rate the respondent likely would have received had it so cooperated, such a rate could never be sufficiently "adverse" within the meaning of § 1677e(b) as to provide any meaningful deterrent to the type of misconduct involved. Where that is the case, a court must be mindful of the purpose of § 1677e(b), which is to allow Commerce to use an *adverse* inference in choosing from among the facts otherwise available.

This case presents just such an extraordinary circumstance. Commerce found, and the record supports, that Koehler engaged in a fraudulent scheme with the objective of preventing Commerce from fulfilling its statutory duty to determine a valid antidumping duty margin. In § 1677e(c), Commerce created a general qualification that applies both to the use of facts

otherwise available (as provided for in § 1677e(a)) and the use of an adverse inference (as

provided for in § 1677e(b)).  But that general qualification must not be read so broadly as to

defeat entirely the more specific purpose of § 1677e(b), under which Commerce must have

discretion to carry out that purpose.  In the rare factual circumstance in which the objectives of

the two provisions come into direct conflict, the more specific purpose of § 1677e(b) must

prevail.  Doing otherwise would produce the absurd result in which Commerce could recognize

the serious misconduct and have no useful authority to apply an inference that is sufficiently

adverse and thereby deter that misconduct in the future.

The rate of 75.36% is, as Koehler argues, numerically higher than Koehler's "commercial

reality," but the commercial reality is also that Koehler set about deliberately to compromise the

outcome of the review.  Commerce found that "Koehler deliberately provided false information,"

*Remand Redetermination* 2, and recounted in the Remand Redetermination the substantial, and

essentially uncontested, evidence supporting that finding, *id.* at 8-10.  Commerce further found

that "the AR2 proceeding has been tainted by Koehler's transshipment scheme . . . ," *id.* at 12,

elaborating that "[i]n particular, as a result of petitioner's allegations and Koehler's

acknowledgment of those allegations, we find that Koehler engaged in an elaborate scheme to

conceal certain otherwise reportable home market sales from the Department that would impact

its normal value and, thus, contribute to an improper reduction of its dumping duties in AR2," *id.*

at 13.  As Commerce itself concluded, the intentional, and fraudulent, misreporting of the home

market sales database prevented Commerce from determining *any* valid margin for Koehler

during the second review.  Commerce explicitly found "that the transshipment scheme

perpetrated by Koehler undermined the reliability and integrity of the entire AR2 proceeding,"

*Remand Redetermination* 36, and this finding is an integral part of the Department's reasoning for imposing the highest rate in any previous segment of the proceeding, which was 75.36%.

While a purpose of the corroboration requirement is to prevent Commerce from "overreaching" in deterring the failure to cooperate, *De Cecco*, 216 F.3d at 1032, the seriousness of the type of misconduct Commerce was seeking through the Remand Redetermination to deter causes the court to conclude that Commerce did not overreach in assigning the 75.36% rate to Koehler.  On this extraordinary record, Commerce was within its discretion in selecting a rate with a substantial "built-in increase," *see id.*  Moreover, the statute expressly allows Commerce to base an adverse inference on information derived from the petition.  19 U.S.C. § 1677e(b)(2)(A).  Commerce determined on this record that a rate set at the highest rate in any previous segment of the proceeding was necessary to serve the purpose of deterrence, and the court will not disturb the exercise of that discretion.

Arguing that Commerce exceeded its discretion, Koehler relies in part on *De Cecco*, *Gallant Ocean (Thai.) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010), and *D&L Supply Co. v. United States*, 113 F.3d 1220, 1223 (Fed. Cir. 1997).  But in these cases, the Court of Appeals was not confronted with a factual situation analogous to that presented here.  The court declines to construe the corroboration requirement so as to eliminate the discretion Commerce must possess to confront the serious misconduct it encountered in this case, in which Koehler undermined the integrity of the proceeding Commerce conducted and prevented Commerce from fulfilling its statutory responsibility.

Koehler maintains that Commerce "clearly imposed a punitive rate" rather than one that was designed "to provide an incentive to cooperate," as it was required to do.  Koehler's Br. 55-56.  The court rejects this argument because Commerce justifiably concluded that

fraudulent action tainting an entire proceeding justifies an adequate deterrent to future

"noncooperation" of the type evidenced by the record in this case.

Koehler's final argument is that Commerce was required to adjust its assigned margin by

taking into account Koehler's home market monthly rebates, citing this Court's decisions in the

litigation contesting the results of the first administrative review; *see Papierfabrik August*

*Koehler AG v. United States*, 38 CIT __, 971 Fed. Supp. 2d 1246 (2014); *Papierfabrik August*

*Koehler AG v. United States*, 38 CIT __, 37 Fed. Supp. 3d 1378 (2014).  This argument lacks

merit because that litigation, unlike the case at bar, did not present a situation that caused

Commerce to seek to apply a total use of facts otherwise available and an adverse inference.

### III. CONCLUSION

For the reasons stated in the foregoing, the court will deny Koehler's motion for

judgment on the agency record, affirm the assignment of the 75.36% rate to Koehler, and enter

judgment accordingly.[12]

                                                    /s/ Timothy C. Stanceu
                                                    Timothy C. Stanceu
                                                    Chief Judge

Dated:  July 6, 2016
        New York, N.Y.

_____

[12] As discussed above, defendant and Koehler have moved for leave to file briefs
pertaining to a Notice of Supplemental Authority filed by defendant.  *See* Def.'s Mot. Leave
Respond Substantive Briefs re: Supp. Auth. (Nov. 20, 2015), ECF No. 130; Pl.'s Mot. Leave
Reply Def. and Def.-Int.'s Resp. re: Notice Supp. Auth. (Dec. 4, 2015), ECF No. 131.
Additionally, Koehler moves for leave to reply to defendant's comments on defendant-
intervenor's notice of supplemental authority.  Pl.'s Mot. Leave to Reply to Def.'s Comments re:
Def.-Int.'s Notice Supp. Auth. (Apr. 14, 2016), ECF No. 141.  The court's judgment grants the
motions for additional briefing and deems the respective briefs to be filed.  The discussions in
these briefs did not cause the court to alter its conclusion to affirm the Remand Redetermination
upon the reasoning set forth in this Opinion.